## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APRESS MEDIA, LLC; CENGAGE LEARNING, INC.; ELSEVIER INC.; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; JOHN WILEY & SONS, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN PUBLISHING GROUP, LLC D/B/A MACMILLAN PUBLISHERS; MCGRAW HILL LLC; PEARSON EDUCATION, INC.; PENGUIN RANDOM HOUSE LLC; SIMON AND SCHUSTER, LLC; AND TAYLOR & FRANCIS GROUP LLC, | Civil Action No. 1:26-cv-01850 |
| | **COMPLAINT FOR:** |
| | **Direct Copyright Infringement** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| ANNA'S ARCHIVE and DOES 1-10, | |
| Defendants. | |

Plaintiffs Apress Media, LLC; Cengage Learning, Inc.; Elsevier Inc.; Hachette Book Group, Inc.; HarperCollins Publishers LLC; John Wiley & Sons, Inc.; Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning; Macmillan Publishing Group, LLC d/b/a Macmillan Publishers; McGraw Hill LLC; Pearson Education, Inc.; Penguin Random House LLC; Simon and Schuster, LLC; and Taylor & Francis Group LLC (collectively, "Plaintiffs" or "Publishers"), by and through their undersigned counsel, for their Complaint against Anna's Archive and Does 1 through 10 (collectively, "Defendants"), hereby allege on personal knowledge as to matters relating to themselves and on information and belief as to all other matters:

## NATURE OF THE ACTION

1.      All of the Plaintiffs are member companies of the Association of American Publishers, the mission of which is to be the voice of American publishing on matters of law and public policy, especially copyright. Publishers bring this action to stop the mass distribution by Defendants of millions of legally protected literary works owned by Publishers that were unlawfully copied from physical and digital books and journals. Publishers' action is now especially critical in light of reports that Anna's Archive is actively advertising that it will provide high speed access to—and indeed has already supplied stolen works of authorship to—developers of large language model AI systems ("LLMs") and data brokers.[1]

2.      Literary works[2] are invaluable works of authorship that have been squarely protected by U.S. copyright law since the Nation's founding. They are often embodied in physical or digital books and journals. Essential to our society, they are the cornerstone of our culture and play a critical role in education and the exchange of information. They teach and entertain us, transport us to new worlds, broaden our horizons, provide us with perspective, and promote an ever-growing body of literary and scientific knowledge in service to the public. Importantly, literary works are not self-generating. They require the creative, intellectual, and business investments of authors and publishers who devote untold hours of expertise, time, and talent to imagine, write, and make them available to readers, through a variety of traditional and new formats and access models. In bearing the costs and risks of such endeavors, publishers operate with the confidence and expectation that their copyrights are enforceable.

---

[1] Anna's Archive website invites LLM developers to copy the entire collection for free or to make a "donation" for faster download speeds. *See infra* at 20-21.

[2] "'Literary works' are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101.

3.      Defendants' primary business is the illegal copying and distribution of literary works. Defendants shamelessly describe themselves as a collection of "pirates" not "bound by the law."[3] In accordance with their belief that "copyright is a net-negative for society,"[4] Defendants have taken it upon themselves to "deliberately violate the copyright law in most countries," including the United States.[5] Indeed, they have made clear that they have only one purpose: to illegally obtain, reproduce, distribute, and profit from works of authorship without regard to the authors, illustrators, publishers, and other creators who own, exercise, license, and make a living from their intellectual property.

4.      The scale of Defendants' infringement is staggering. Anna's Archive was created with the express goal "to take all the books in the world," and it continues its illegal conduct in pursuit of this unlawful aim.[6] Through its various websites including annas-archive.gl, annas-archive.vg, annas-archive.pk, annas-archive.gd (together, the "Website"), Anna's Archive hosts over 63 million books and 95 million papers.[7] Its stolen collection of literary works comprises an almost unfathomable 1 Petabyte (1000 TB) of data in total.[8]

5.      Most recently, Anna's Archive illegally copied and distributed through its Website 86 million audio files from Spotify USA Inc., along with metadata for 256 million audio files, forcing the copyright owners into legal action. *See Atlantic Recording Corp. v. Anna's Archive*, Case No. 1:26-cv-00002-JSR (S.D.N.Y.) (hereinafter "*Atlantic*"). Despite this Court's

---

[3] *Anna's Blog, How to Become a Pirate Archivist*, ANNA'S ARCHIVE (Oct. 17, 2022), https://annas-archive.gl/blog/blog-how-to-become-a-pirate-archivist.html.
[4] *Anna's Blog, How to Run a Shadow Library: Operations at Anna's Archive*, ANNA'S ARCHIVE (Mar. 19, 2023), https://annas-archive.gl/blog/how-to-run-a-shadow-library.html.
[5] *Anna's Blog, Introducing the Pirate Library Mirror: Preserving 7TB of books (that are not in Libgen)*, ANNA'S ARCHIVE (Jul. 1, 2022), https://annas-archive.gl/blog/blog-introducing.html.
[6] *Anna's Blog, ISBNdb Dump, or How Many Books Are Preserved Forever*, ANNA'S ARCHIVE (Oct. 31, 2022), https://annas-archive.gl/blog/blog-isbndb-dump-how-many-books-are-preserved-forever.html.
[7] *Homepage*, ANNA'S ARCHIVE, https://annas-archive.gl/ (last visited March 4, 2026).
[8] *Anna's Blog, The Critical Window of Shadow Libraries*, ANNA'S ARCHIVE (Jul. 16, 2024), https://annas-archive.gl/blog/critical-window.html.

preliminary injunction order in that case dated January 20, 2026 ("*Atlantic* Order"), Defendants

continue to foster piracy on an astronomical scale. The *Atlantic* complaint alleged that Anna's

Archive purported to host "61,344,044 books" and "95,527,824 papers" as of the date of filing

on December 29, 2025. ECF No. 8, at 8. That Anna's Archive has apparently added over

2,000,000 books and 100,000 papers in the short time since the *Atlantic* complaint was filed

speaks to the egregious scale of Defendants' infringement.

6.     Anna's Archive displays on its Website a monthly rolling average of its users'

downloads of the works hosted on its site. According to its own metrics, on March 3, 2026,

Anna's Archive has averaged 763k downloads per day or **32k downloads per hour** in the last 30

days,[9] despite this Court's existing orders:



Hourly downloads in the last 30 days. Hourly average: 32k. Daily average: 763k.

7.     Importantly, the *Atlantic* Order is limited to the music copyrights owned by the

plaintiffs in that case. Were the Defendants to repost the contents of its illegal repository of

stolen works without these audio files, the *Atlantic* Order would still be satisfied. Nor can the

publisher Plaintiffs in this case enforce the *Atlantic* Order to protect their own copyrights.

Accordingly, Plaintiffs bring this case to ensure their works are protected and to stop

Defendants' intentional, widespread, and ongoing unlawful reproduction and distribution of

literary works in the United States, to the detriment of Publishers, authors, and the public.

---

[9] *Frequently Asked Questions (FAQ)*, *What is Anna's Archive?,* ANNA'S ARCHIVE, https://annas-archive.gl/faq/ (last visited March 3, 2026).

## THE PARTIES

### A. Plaintiffs

8.    Plaintiffs are thirteen leading publishers of books and journals in the United States. Working closely with their authors, Plaintiffs source, develop, edit, publish, reproduce, market, and distribute tens of thousands of literary works per year, across the full spectrum of genres and topics and through a variety of formats, access, and delivery models.

9.    Plaintiff Apress Media, LLC ("Apress") is a part of Springer Nature, one of the world's leading publishers of scientific and technical books with offices at One New York Plaza, New York, New York 10004. With a portfolio of over 2,700 journals and over 220,000 books, Springer Nature is a global leader in academic and scientific publishing.

10.    Plaintiff Cengage Learning, Inc. ("Cengage") is a Delaware corporation with its principal place of business at 10650 Toebben Drive, Suite A, Independence, Kentucky 41051. Cengage is a prominent American educational technology and content provider. It is one of the largest college textbook publishers in the United States and specializes in delivering digital and print learning solutions for various markets, including K-12, higher education, vocational training, and library services.

11.    Plaintiff Elsevier Inc. ("Elsevier") is a Delaware corporation with its principal place of business at 230 Park Avenue, New York, New York 10169. Elsevier is a premier global academic publishing company and information analytics business. Founded in 1880, the company specializes in publishing technical, medical, and scientific content, with a portfolio that includes prestigious academic research journals such as The Lancet and Cell Press. Elsevier publishes more than 600,000 articles annually and its catalog receives over one billion annual downloads.

5

12.    Plaintiff Hachette Book Group, Inc. ("Hachette") is a Delaware corporation with its principal place of business at 1290 Sixth Avenue, New York, New York 10104. With a history stretching back to 1837, Hachette is a leading general-interest publisher of books, games, puzzles, and other products. Hachette books and authors have won Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Its many publishing imprints include prominent brands such as Little, Brown and Company, Moon Travel, Running Press, Workman Publishing, Union Square, Little, Brown Books for Young Readers, Grand Central Publishing, Basic Books, Public Affairs, Orbit, FaithWords, and Center Street.

13.    Plaintiff HarperCollins Publishers LLC ("HarperCollins") is a Delaware limited liability company with its principal place of business at 195 Broadway, New York, New York 10007. HarperCollins has more than 200 years of history in the book publishing industry and the company now operates more than 120 imprints and brands in 17 countries worldwide. Each year, HarperCollins publishes approximately 10,000 new books in more than a dozen languages and boasts a catalogue of more than 200,000 titles in print and digital formats. Working across a wide range of genres, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among other honors.

14.    Plaintiff John Wiley & Sons, Inc. ("Wiley") is a New York corporation with its principal place of business at 111 River Street, Hoboken, New Jersey 07030. Founded in 1807 in Manhattan, Wiley has over 200 years of experience publishing scientific, professional, and education books and journals in print and digital formats. Wiley has published works by over 450 Nobel Laureates. Today Wiley is known for publishing not only the For Dummies series but

also many important journals and textbooks. Wiley publishes over 1,800 peer-reviewed scholarly journals and over 2,000 new books each year. It currently offers over 120,000 titles.

15.    Plaintiff Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning ("Macmillan Learning") is a New York limited liability company with its principal place of business at 120 Broadway, New York, New York 10271. Macmillan Learning is a privately held, family-owned company that inspires what's possible for every learner.

16.    Plaintiff Macmillan Publishing Group, LLC d/b/a Macmillan Publishers ("Macmillan Publishers") is a New York limited liability company with its principal place of business at 120 Broadway, New York, New York 10271. Macmillan Publishers is a leading publishing company and home to some of the world's most cherished authors and creators. It publishes a wide range of genres and formats for every kind of reader, from adult fiction and nonfiction to many inspired children's books across eight divisions: Celadon Books, Farrar, Straus & Giroux, Flatiron Books, Henry Holt, Macmillan Audio, Macmillan Children's Publishing Group, The St. Martin's Publishing Group, and Tor Publishing Group. Its Works in Suit feature bestselling, award-winning literary talent, including the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, the Newbery Medal, and the Caldecott Medal.

17.    Plaintiff McGraw Hill LLC ("McGraw Hill") is a Delaware limited liability company with its principal place of business at 8787 Orion Place, Columbus, Ohio 43240. McGraw Hill is a leading global provider of education solutions for preK-12, higher education, and professional learning. Founded over 130 years ago, it provides print and digital content, software, and services from PreK-12 to higher education and professional markets.

18.    Plaintiff Pearson Education, Inc. ("Pearson") the world's lifelong learning company, is a Delaware corporation with its principal place of business at 221 River Street, Hoboken, New Jersey 07030.  Pearson has decades of history in publishing academic textbooks and digital learning experiences used to help millions of higher education students every year. Pearson partners with thousands of expert authors, including winners of the Nobel Prize, Turing Award, and Pulitzer Prize, to create learning materials across academic disciplines, with particular strength in science, technology, engineering and math (STEM). Pearson serves customers in nearly 200 countries with digital content, assessments, qualifications, and data.

19.    Plaintiff Penguin Random House LLC ("Penguin Random House") is a Delaware limited liability company with its principal place of business at 1745 Broadway, New York, New York 10019. Penguin Random House traces the history of some of its imprints back to the mid-nineteenth century and has published numerous Nobel Laureates, Pulitzer Prize winners and landmark works of the twentieth century including the first authorized edition of James Joyce's *Ulysses* in the English-speaking world. The portfolio operated by Penguin Random House has grown to encompass nearly 275 independent imprints and brands across five continents. Penguin Random House publishes 15,000 new titles per year—catering to readers of all ages and at every stage of life—and sells close to 800 million print books, audiobooks, and eBooks annually. It has published hundreds of the most widely read authors in the world.

20.    Plaintiff Simon and Schuster, LLC ("Simon & Schuster") is a New York limited liability company with its principal place of business at 1230 Avenue of the Americas, New York, New York 10020. Simon & Schuster was founded in New York City in 1924 and has been the home of such famous authors as F. Scott Fitzgerald, Ernest Hemingway, Hunter S. Thompson, Shel Silverstein, and Dan Brown, among many others. It is a global leader in general

interest publishing, dedicated to providing the best in fiction and nonfiction for readers of all ages.

21.    Plaintiff Taylor & Francis Group LLC ("Taylor & Francis") is a Delaware limited liability company with offices at 605 Third Avenue, New York, New York 10158. Taylor & Francis is part of Taylor & Francis Group, one of the world's leading academic publishers. Taylor & Francis Group publishes more than 2,500 journals and 8,000 new books each year.

**B. Defendants**

22.    Defendant Anna's Archive, previously known as the "Pirate Library Mirror" (or "PiLiMi"), holds itself out as a non-profit organization. As an organization dedicated to online piracy, Anna's Archive has acknowledged it "need[s] to stay anonymous."[10] Accordingly, its incorporation status and principal place of business are unknown.

23.    Defendants Does 1-10 are individuals who own and/or operate Anna's Archive and who are responsible for the illegal conduct alleged herein. Plaintiffs currently are unaware of the true names or addresses of the Defendants sued herein by the fictitious designations Does 1-10 and, for that reason, sue them by those designations. If Publishers ascertain their identities, Publishers will seek leave of the Court to amend this Complaint to include Defendant Does 1-10 as named defendants.

<u>**JURISDICTION AND VENUE**</u>

24.    Publishers bring a claim against Defendants for direct copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

---

[10] *Anna's Blog, How to Run a Shadow Library: Operations at Anna's Archive*, *supra* note 4.

26.     This Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law and Rules ("CPLR") § 302(a)(1) because Defendants transact business in New York State, including, accepting payment from New York residents.

27.     This Court also has personal jurisdiction over Defendants pursuant to CPLR § 302(a)(3). Anna's Archive is operated by individuals who reside outside of the United States and who committed the tortious acts that give rise to Publishers' claims outside of New York. Defendants have caused injury within New York to Publishers that maintain their principal place of business in, or conduct substantial business in, the state, including by allowing internet users to download Publishers' Works in Suit for free on the infringing Website and knew or reasonably should have known its acts would have consequences in this State, all while deriving substantial revenue from interstate commerce.

28.     Pursuant to CPLR § 302(a)(3)(i), Defendants regularly do or solicit business in New York State, engage in a persistent course of conduct in New York State, and derive substantial revenue from services rendered in New York State. For example, Anna's Archive distributes copyrighted content to New York State residents without authorization, and it further accepts payments from New York residents in exchange for faster downloads of infringing content.

29.     Pursuant to CPLR § 302(a)(3)(ii), Defendants expect or should reasonably expect that their tortious acts would have consequences in New York State, because Defendants' conduct has caused injury to Plaintiffs who maintain their principal places of business in, or conduct substantial business in, the state. Defendants also derive substantial revenue from interstate or international commerce.

30.     In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2), as this action involves claims arising under federal law and Defendants have targeted their unauthorized distribution of copyrighted material to a United States audience and the Anna's Archive website is visited millions of times each month by users in the United States. Defendants have also accepted payment from users in the United States, transacted with third parties in the United States, and engaged in the unauthorized reproduction and distribution of Works in Suit in the United States. Furthermore, according to data from the website tracking service Similarweb, the primary websites that comprise Anna's Archive collectively have over 50 million monthly visitors, nearly 20 percent of whom are in the United States. More of Anna's Archive's users are in the United States than are in any other country, making the United States the single largest market for Anna's Archive.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), including because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendants are subject to personal jurisdiction in this District and thus may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(1) because, to the best of Publishers' knowledge, no Defendants are residents of the United States.

## FACTUAL BACKGROUND

### A.  Publishers' Businesses and Copyrights

32.     In the United States, the publishing industry dates back to the dawn of our democracy. Many of the publishing houses that are Plaintiffs in this case have long and storied histories spanning many decades, and in some instances over a century.

33.     Publishers develop, market, distribute, license, and sell literary works in physical and digital formats, in close collaboration with their respective authors. Publishers invest significant time and money into publishing their works, including in content creation, advertising, marketing, promotion, and distribution. Publishers expend these resources in reliance on the enforceable exclusive rights afforded by copyright law, which safeguard the commercial viability of their efforts. The steadfastness of the law, in turn, allows Publishers to continue to invest in the production of new literary works, to the benefit of society.

**B. The Works in Suit**

34.     Publishers own or control the copyrights to many works of authorship under U.S. law, including many of the world's most important and popular works of literature and invaluable educational, scholarly, and scientific texts. These rights include the exclusive rights to reproduce and distribute in the United States in physical and e-book formats the literary works listed in Exhibit A (the "Works in Suit"). The 130 Works in Suit are a small sample of the works for which Publishers own or exclusively control copyrights, representative of the enormous scale of piracy perpetrated by Defendants.

35.     The Works in Suit represent a cross-section of the exceptional literary works that are made possible by a functioning publishing ecosystem, from perennial classic novels to more recent highly acclaimed works of fiction, non-fiction, children's works, and much more. Some of the most awarded works of fiction ever published find their place among the Works in Suit in suit, including *The Corrections* by Jonathan Franzen, published by Macmillan Publishers. This novel won the 2001 National Book Award for Fiction, the 2002 James Tait Black Memorial Prize, and was a finalist for the 2002 Pulitzer Prize for Fiction. It was also included in *TIME* magazine's list of the 100 best English-language novels since 1923. The Works in Suit

also include the bestselling novel *Presumed Innocent* by Scott Turow, published by Hachette; the Pulitzer Prize winning *Empire Falls* by Richard Russo, published by Penguin Random House; the occult staple *The Modern Guide to Witchcraft* by Skye Alexander, published by Simon & Schuster; and the young adult novel *Partials* by Dan Wells, published by Harper Collins.

36.    The Works in Suit also contain outstanding examples of educational books that are core to many high school, college, and university academic programs, as well as scientific, medical, and technical journal articles that are important to further scientific study and research. The Works in Suit contain multiple titles from the popular *For Dummies* series published by Wiley, which have taught intrepid readers the basics of everything from English grammar to PowerPoint. They also include some of the most widely used textbooks and academic works from multiple fields, including *International Economics* by James Gerber published by Pearson; *Atlas of the Human Body* by Branislav Vidic, published by Elsevier; *Film History: An Introduction* published by McGraw Hill; *Business Law: Text and Cases* by Kenneth Clarkson, published by Cengage; *The Practice of Statistics* by Daren Starnes, published by Macmillan Learning; *Introduction to Search Engine Marketing and Adwords* by Todd Kelsey, published by Apress; and *Explorations in Computing* by John Conery, published by Taylor & Francis.

37.    Publishers' works are available for sale in the United States, including from authorized online and physical retailers, as well as the Publishers' direct sales channels.

38.    The Works in Suit have all been properly registered with the U.S. Copyright Office. The Works in Suit were published with copyright notice pages pursuant to 17 U.S.C. § 401, containing a (c) copyright symbol, the date of first publication and the rightsholder's name. This information, among other indicia of ownership, is sufficient to alert users that these works are protected by copyright.

39.    All of the Works in Suit have been downloaded, reproduced, and distributed by Defendants.

**C. Anna's Archive Is Not a Library of Any Kind; It Is a Notorious Pirate Site that Illegally Reproduces and Distributes Publishers' Literary Works on a Massive Scale**

40.    Anna's Archive claims to be "the world's largest shadow library."[11] While the moniker "shadow library" is sometimes used in reference to Anna's Archive, calling it a library of any kind is incorrect. It is more accurate to refer to it as a Notorious Pirate Site or Network.[12] Libraries are trusted institutions that serve the communities that fund them by lending books and other publications they have lawfully acquired. Using this label for Anna's Archive explicitly misleads the public and allows Anna's Archive to hijack the goodwill that libraries enjoy and have legitimately earned. Instead, Notorious Pirate Sites like Anna's Archive are websites that reproduce and distribute works of authorship owned by others to users for a profit, despite no authorization from or compensation to copyright owners.

41.    Anna's Archive launched in July 2022 as the "Pirate Library Mirror" (or "PiLiMi").[13] As Anna's Archive explained at the time, its original name derived from the fact that the operators "deliberately violate the copyright law in most countries" (i.e., are "pirates"), "focus primarily on written materials like books" (and thus claim to be a "library"), and were then "strictly a mirror of existing" Notorious Pirate Sites. As part of its first project in October

---

[11] *Anna's Blog,* Anna's Archive, https://annas-archive.gl/blog/ (last visited March 3, 2026).
[12] "Notorious Pirate Site," "Notorious Online Site" or "Notorious Pirate Network" are the terms generally used by rightsholders to describe the most egregious internet services whose businesses are based on providing copies or access to content without the consent of the copyright holders. Rightsholders list Notorious Pirate Sites in submissions to the United States Trade Representative (USTR) for its use in compiling the Special 301 Report pursuant to Section 182 of the Trade Act of 1974, as amended (the Trade Act, 19 U.S.C. § 2242) and the Notorious Markets Report for Counterfeiting and Piracy. *See, e.g.*, International Intellectual Property Alliance Written Submission in Response to USTR's Request for Comments and Notice of a Public Hearing Regarding the 2022 Special 301 Review (January 31, 2022), at 19, https://www.iipa.org/files/uploads/2025/11/Special-301-2025.pdf; Association of American Publishers 2024 Special 301 Out-of-Cycle Review of Notorious Markets at 2-4, https://www.regulations.gov/comment/USTR-2024-0013-0005.
[13] *Anna's Blog, Introducing the Pirate Library Mirror, supra* note 5.

2022, Anna's Archive mirrored the contents of Z-Library, which it described as "a popular (and illegal) library"[14] and Library Genesis or "LibGen", one of the world's largest Notorious Pirate Sites. Anna's Archive copied over 10 million files from Z-Library and LibGen.[15] Both LibGen and Z-Library had already been subject to prior court orders when Defendants mirrored them. Two U.S. federal courts found LibGen liable for willful copyright infringement and issued broad permanent injunctions against further infringement.[16] In October 2022, the United States Department of Justice and Federal Bureau of Investigation brought criminal charges against two individuals accused of operating Z-Library and shortly thereafter seized over 200 Z-Library domain names.[17] Anna's Archive has moved beyond mirroring other illegal collections and has acquired additional pirated works, including nearly 13 million files unique to Anna's Archive.[18]

  42. The scale of Anna's Archive's infringement is stunning. Its stolen collection of books, journal articles, and other materials is nearly 1 Petabyte (1000 TB) in total.[19] As Defendants admit, they "don't bother with widely available collections, such as public domain books," because "[l]egal entities often already take good care of that."[20] Plaintiffs are not aware that any of the copyright-protected works on Anna's Archive are licensed or authorized by the copyright owners; to the contrary, their reproduction and distributions are blatantly illegal infringements.

---

[14] *Anna's Blog, 3x New Books Added to the Pirate Library Mirror (+24TB, 3.8 Million Books)*, ANNA'S ARCHIVE (Sept. 25, 2022), https://annas-archive.gl/blog/blog-3x-new-books.html.

[15] *Anna's Blog, ISBNdb Dump, or How Many Books Are Preserved Forever*, *supra* note 6.

[16] *See Cengage Learning Inc. et al. v. Does 1-50 d/b/a Library Genesis*, Case No. 23-cv-08316-CM (S.D.N.Y. Sept. 24, 2024), Dkt. 36; *Elsevier Inc. v. Sci-Hub*, No. 15-cv-4282 (RWS), 2017 WL 3868800 (S.D.N.Y. June 21, 2017).

[17] Two Russian Nationals Charged with Running Massive E-Book Piracy Website, U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF NEW YORK (Nov. 16, 2022), https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book piracy-website.

[18] *Datasets*, ANNA'S ARCHIVE, https://annas-archive.gl/datasets (last visited March 3, 2026).

[19] *Anna's Blog, The Critical Window of Shadow Libraries*, *supra* note 8.

[20] *Id.*

43.     Until recently, Anna's Archive was accessible through numerous internet domains. Although several have been suspended in response to court orders including the *Atlantic* Order, Defendants routinely secure new domains as older ones are blocked. As of the date of this filing, it is available to users around the world including in the United States at annas-annas-archive.gl, annas-archive.vg, annas-archive.pk and annas-archive.gd.[21] The ".gl" top-level domain is reserved for Greenland, ".vg" for the British Virgin Islands, ".pk" for Pakistan, and ".gd" for Grenada. However, it is not necessary for a website operator to have any association with these countries to acquire and use these domain names. Defendants anonymously registered these websites using various private, foreign domain registrars.

44.     Defendants are not content merely to copy written works for alleged "preservation." They also distribute these works to users. Anna's Archive invites users to search via a text box on the Website for files in its illegal repository of infringing works and provides a list of links to "Partner Server[s]" that allow users to download the files.[22] For example, *Innocent*, by Scott Turow, is one of the Works in Suit and for which Hachette exclusively controls the reproduction and distribution rights in the United States. A search of Anna's Archive results in numerous results for this work, representing different copies obtained from Z-Library and individual uploaders. Selecting one of those versions then directs the user to a page with 20 links to download that copy through Defendants' Website – 11 from "Fast Partner Servers" and 9 from "Slow Partner Servers".[23]

---

[21] After the *Atlantic* Order was entered on January 21, 2025, the ".org," ".pm," ".in," and ".se" domains were no longer operational. The ".li" domain appeared to cease functioning in early March 2026. Shortly thereafter, several new domains were available.

[22] *Search Result*, ANNA'S ARCHIVE, https://annas-archive.gl/md5/c9ae85a5a8a9fb5c12aaffd9accf1943 (last visited March 3, 2026).

[23] *Id.*



45.      Although the Website describes the files as available through "Partner Server[s],"

Defendants explain on their FAQ that these files come from servers they control, together with

their so-called partners: "[W]e implemented two systems for free downloads, with our partners:

shared servers with slow downloads, and slightly faster servers with a waitlist." Defendants

explain that they installed the waitlist "to reduce the number of people downloading at the same time" and further deploy a "browser verification for our slow downloads, because otherwise bots and scrapers will abuse them, making things even slower for legitimate users."[24] Defendants can only implement these techniques on servers they control for files they host.

46.     That Defendants host the infringing content on their own servers is further illustrated through the files themselves. Returning to the example of *Innocent*, clicking on any of the Partner Server files will open another page where that file appears for download. In order to access one of the fast downloads, the user must open an Anna's Archive account. However, the slow downloads are freely available. Selecting the first Slow Partner file opens a page where the file URL appears. The URL includes the name "Annas Archive" and downloads directly from the Website with a single click:[25]



47.     For users who wish to download more than an individual book, Defendants recommend users utilize the BitTorrent protocol to "torrent" large amounts of data. BitTorrent is a form of peer-to-peer ("P2P") file sharing overwhelmingly used to illegally reproduce and

---

[24] *Frequently Asked Questions (FAQ)*, *Why are the slow downloads so slow?"*, ANNA'S ARCHIVE, https://annas-archive.gl/faq#slow (last visited March 3, 2026).
[25] *Search Result*, ANNA'S ARCHIVE, *supra* note 22.

distribute copyrighted material. Users access BitTorrent using software referred to as a "client." BitTorrent clients connect users to a network of other users or peers who are also using BitTorrent, collectively referred to as a "swarm," who upload and download the content that each is hosting. BitTorrent divides files into "pieces," and users download different pieces of a file from multiple different users simultaneously. A user who has every piece of a particular file becomes a "seeder" for that file and will by default continue to distribute ("seed") the file to others in the swarm. And files on BitTorrent can be shared simultaneously with thousands of other users. Once an infringing file is distributed on BitTorrent, there is no containing it, as the viral nature of online infringement enables massive proliferation across a limitless universe of users. Indeed, a single file can be distributed thousands of times in mere hours.

48.     A user looking to download content using BitTorrent must first obtain a "torrent" hash file, which allows a client to identify peers in the swarm who are seeding the content or have pieces of it. A torrent can either identify a single file for download or, more commonly, a group of files. When a user runs a torrent hash file, their BitTorrent client connects their computer with peers to download pieces of the relevant content file or files until the download of the content is complete. Given this structure, distribution of content through the BitTorrent network is "viral" in nature, in that the content spreads quickly and widely across the internet, reaching a massive audience in a very short time.

49.     Anna's Archive routinely tracks the availability of literary works on BitTorrent and then creates torrent hash files that it hosts on the Website. Anna's Archive maintains a "Torrents" page where users can download numerous torrent files, including for the copyrighted works it downloaded from Z-Library, LibGen, and other Notorious Pirate Sites.[26] Users can copy

---

[26] *Torrents*, ANNA'S ARCHIVE, https://annas-archive.gl/torrents/ (last visited March 3, 2026).

these torrent hash files and use them to illegally download copyrighted works and distribute copies of these works on BitTorrent for further distribution to and download by others.

50.     Users of Anna's Archive are also explicitly invited to "help out" by "seeding torrents."[27]  Defendants encourage and facilitate this conduct by going so far as to provide step-by-step instructions others can follow to become seeders of infringing works and thus become "pirate archivists" themselves:[28]



### Help seed on IPFS

If you have spare bandwidth and space available, it would be immensely helpful to help seed our collection. These are roughly the steps to take:

1. Get the data from BitTorrent (we have many more seeders there currently, and it is faster because of fewer individual files than in IPFS). We don't link to it from here, but just Google for "Pirate Library Mirror" (EDIT: moved to Anna's Archive).
2. For data in the second release, mount the TAR files using ratarmount, as described in our previous blog post. We have also published the SQLite metadata in a separate torrent, for your convenience. Just put those files next to the TAR files.
3. Launch one or multiple IPFS servers (see previous blog post; we currently use 4 servers in Docker). We recommend the configuration from above, but at a minimum make sure to enable Experimental.FilestoreEnabled. Be sure to put it behind a VPN or use a server that cannot be traced to you personally.
4. Run something like ipfs add --nocopy --recursive --hash=blake2b-256 --chunker=size-1048576 data-directory/. Be sure to use these exact hash and chunker values, otherwise you will get a different CID! It might be good to do a quick test run and make sure your CIDs match with ours (we also posted a CSV file with our CIDs in one of the torrents). This can take a long time — multiple weeks for everything, if you use a single IPFS instance!
5. Alternatively, you can do what we did: add in offline mode first, add the files, then take the node online, peer with public gateways, and then finally run ipfs dht provide -r <root-cid>. This has the advantage that you'll start seeding files to public gateways sooner, but it is more involved.

If this is all too involved for you, or you only want to seed a small subset of the data, then it might be easier to pin a few directories:

1. Use a VPN.
2. Install an IPFS client.
3. Google the "Pirate Library Mirror" (EDIT: moved to Anna's Archive), go to "The Z-Library Collection", and find a list of directory CIDs at the bottom of the page.
4. Pin one or more of these CIDs. It will automatically start downloading and seeding. You might need to open a port in your router for optimal performance
5. If you have any more questions, be sure to check out the Library Genesis IPFS guide.

---

[27] *Homepage*, ANNA'S ARCHIVE, *supra* note 7.
[28] *Anna's Blog, Help Seed Z-Library on IPFS*, ANNA'S ARCHIVE (Nov. 22, 2022), https://annas-archive.gl/blog/help-seed-zlibrary-on-ipfs.html.

**D. Defendants Profit from Infringement Including from LLM Developers**

51.    Defendants directly profit from their mass infringement business. Anna's Archive seeks donations through its "Donate" page, and it has solicited "other types of support, such as grants, long-term sponsors, high-risk payment providers, perhaps even (tasteful!) ads."[29]  Its blog posts announcing new illegal collections frequently include a solicitation for new donations as renumeration for Defendants' unlawful activities.[30] It solicits users to provide anonymous "donations" of between $2 per month and $100 per month using untraceable methods such as gift cards or cryptocurrency. For the copyrighted content hosted directly by Anna's Archive, download speeds for free users on Anna's Archive are typically very slow. However, in exchange for a "donation," users receive "fast downloads" via BitTorrent and avoid waitlists. Given the volume of the pirated files Anna's Archive encourages its users to download, buying this extra download speed is a practical necessity. Defendants also solicit "[e]nterprise-level donation[s]" in exchange for "[u]nlimited high-speed access" and other services.[31] In reality, these "donations" are paid memberships, and Anna's Archive explicitly refers to donations as "memberships" on its FAQ page.[32]

52.    Anna's Archive has been an illegal supplier of stolen content to the AI industry. Anna's Archive publicly claims to have given "high-speed access" to its illegal collection of more than 140 million copyrighted texts to companies in China, Russia, and elsewhere, many of

---

[29] *Anna's Blog, How to Run a Shadow Library: Operations at Anna's Archive*, *supra* note 4.
[30] *Anna's Blog, Putting 5,998,794 books on IPFS*, ANNA'S ARCHIVE (Nov. 19, 2022), https://annas-archive.gl/blog/putting-5,998,794-books-on-ipfs.html ("[P]lease consider donating through one of our crypto addresses."); *Anna's Blog, ISBNdb Dump, or How Many Books Are Preserved Forever?*, *supra* note 6 ("[I]f you want to support this work, please consider making a donation. . . . For now we take donations in crypto; see the Donate page on Anna's Archive.")
[31] *Donate*, ANNA'S ARCHIVE, https://annas-archive.gl/donate/ (last visited March 3, 2026).
[32] *Frequently Asked Questions (FAQ)*, *Donation FAQ,* ANNA'S ARCHIVE, *supra* note 9.

them LLMs.[33] One court in the Northern District of California recently found that Meta Platforms torrented the contents of Anna's Archive for use in developing its LLM model Llama.[34] Seeking to capitalize on this market, Anna's Archive now directly solicits the AI industry to purchase high-speed access to its collection. Defendants recently posted a blog to their Website entitled "If You're an LLM, Please Read This" which invites LLM developers to copy large amounts of data at fast download speeds by "making an enterprise-level donation."[35]

53.      The amount of the "enterprise-level donation" is not specified on the Website but it is reported to be $200,000. In an e-mail exchange with a researcher inquiring about the cost of the collection for AI training, Anna's Archive offered premium access for $200,000:

> [E]xpert access gives you direct high speed SFTP access to all our files in the https://annas-archive.se/torrents lists, and more. Files that are already released through torrents can be obtained for free that way, however our high speed access is much faster than downloading through torrents. For full unlimited access to all these collections, we ask for a donation of $200,000 to be made using cryptocurrency (Monero, Bitcoin, Ethereum, USDT, USCD, etc). We're also open to trading this access for collections that we don't have yet, or for prorating access proportionally to parts of our collection.[36]

**E.  Defendants' Infringement Is Knowing and Willful**

54.      Defendants admit they are violating the law. They proudly describe themselves as "pirates" not "bound by the law"[37] who "deliberately violate the copyright law in most countries."[38]  As such, the operators of Anna's Archive proclaim that they are "at high risk of being arrested" and "could face decades of prison time."[39] Accordingly, they are "very careful

---

[33] See Margaux Poueymirou and Maxwell V. Pritt, *Why AI's Use of Shadow Libraries Should Alarm Us All,* DAILY JOURNAL (June 16, 2025), https://www.dailyjournal.com/articles/386130-why-ai-s-use-of-shadow-libraries-should-alarm-us-all.
[34] *Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1041 (N.D. Ca. 2025).
[35] *Anna's Blog, If You're an LLM, Please Read This,* ANNA'S ARCHIVE (Feb. 18, 2026), https://annas-archive.gl/blog/llms-txt.html.
[36] Ed Newton-Rex, LINKEDIN (January 22, 2026), https://www.linkedin.com/posts/ed-newton-rex_a-few-months-ago-i-was-curious-to-know-how-activity-7420048307655200768-buoq/.
[37] *Anna's Blog, How to Become a Pirate Archivist, supra* note 3.
[38] *Anna's Blog, Introducing the Pirate Library Mirror, supra* note 5.
[39] *Anna's Blog, How to Become a Pirate Archivist, supra* note 3.

not to leave any trace" and have "strong operational security."[40] The pirates who operate Anna's Archive remain anonymous, referring to themselves with the pseudonym "Anna." Defendants engage in this shamelessly illegal conduct outside of the U.S. borders, knowing that their conduct has an impact within our country.

55.     While Defendants have infringed multiple genres of media, Publishers and their authors have been the primary targets of their illegal conduct. From the beginning, Anna's Archive's express goal has been to "take all the books in the world."[41]  As Anna's Archive has explained, it specifically targets "papers and books" because of their "information density," claiming  that "written text stores the most information out of all media" per megabyte of storage.[42]  Operating unchecked, Defendants' illegal collection of books continues—by their own admission— to "grow[] at a rapid clip,"[43] with more than 63 million infringed books and counting. Despite this Court's prior order, Anna's Archive continues to distribute these literary works "in bulk" via illegal torrents.[44]

56.     Anna's Archive does not merely link to literary works hosted by others. Defendants have gone further, directly hosting content files for books and journals, including admitting to hosting "31TB of books from Z-Library."[45] Defendants both link to and host Publishers' copyright protected books and journal articles, including the Works in Suit. Defendants concede linking and hosting are both unlawful under United States law.[46]

---

[40] *Id.*
[41] *Anna's Blog, ISBNdb Dump, or How Many Books Are Preserved Forever*, *supra* note 6.
[42] *Anna's Blog, The Critical Window of Shadow Libraries*, *supra* note 8.
[43] *Id.*
[44] *Id.*
[45] *Anna's Blog, Help Seed Z-Library on IPFS*, *supra* note 28.
[46] *Anna's Blog, How to Run a Shadow Library: Operations at Anna's Archive*, *supra* note 4 ("In many jurisdictions it is not only illegal to distribute copyrighted works, but also to link to places that do. A classic example of this is the United States' DMCA law.")

## F. Defendants' Conduct Harms Publishers

57.     Despite its claims to be a non-profit enterprise, it is a for-profit commercial operation that has engaged in extensive reproduction and distribution of Publishers' works. It makes Publishers' works available on its Website to users for free, depriving Publishers of both individual sales and license fees from developers who might be interested in a larger number of works.

58.     Defendants' use of BitTorrent to distribute the works it has stolen is particularly pernicious, because each file can be distributed hundreds or thousands of times through the swarm. Defendants' widescale use of BitTorrent also contributes to the continued viability and normalization of that infringing protocol.

59.     Defendants' unauthorized use of Publishers' works also denies them control over how their creative works are reproduced and distributed, rights guaranteed by the Copyright Act. It also undermines the incentive for authors to continue to produce literary works and for Publishers to invest in, support, and exploit those creative efforts. The sheer breadth and scope of Anna's Archive's infringing conduct makes it effectively impossible to measure, calculate, or even estimate the financial damage it inflicts on Publishers.

60.     Defendants' unauthorized use also undercuts the existing and potential markets for Publishers' works as LLM training data and for myriad other uses and undermines those legitimate business and services that properly license these works.

61.     Accordingly, Publishers have been left with no choice but to file this lawsuit to put an end to Defendants' ongoing infringement of their rights and remedy the significant harm they have caused and continue to cause.

**CLAIM FOR RELIEF**

**Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)**

62.     Publishers repeat and reallege every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.     The Works in Suit are original, creative, and copyrightable subject matter under the laws of the United States.

64.     The copyrights in the Works in Suit are registered, and the Copyright Office has issued valid Certificates of Registration for the Works.

65.     Defendants have infringed and will continue to infringe Publishers' copyrighted works, including without limitation, the Works in Suit listed in Exhibit A hereto, by, *inter alia*, reproducing, distributing, publicly performing, and making derivative works of the Works in Suit.

66.     Publishers have not provided Defendants with permission or consent to reproduce or distribute their copyrighted works, including without limitation, the Works in Suit listed in Exhibit A hereto.

67.     The reproduction and distribution of Publishers' copyrighted works, including without limitation, the Works in Suit listed in Exhibit A hereto, constitutes infringements of the Publishers' registered copyrights and their exclusive rights under 17 U.S.C. § 106(1) and (3).

68.     Each infringing reproduction or distribution of Publishers' copyrighted works, including without limitation, the Works in Suit listed in Exhibit A hereto constitutes a separate and distinct act of copyright infringement.

69.     Defendants have willfully, intentionally, and purposefully infringed Publishers' copyrighted works, including without limitation, the Works in Suit listed in Exhibit A hereto.

Defendants' willful infringement is evidenced by, among other things, Anna's Archive's stated admissions that it is comprised of "pirates" who are not "bound by the law," that it "deliberately" violates the copyright laws of most countries, and its express "aim" is to "take all the books in the world."

70.    As a direct and proximate result of its wrongful conduct, Defendants have and will obtain benefits, including, but not limited to, profits to which Defendants are not entitled.

71.    The extent of Publishers' losses arising from Defendants' illegal conduct is staggering. Publishers have suffered damages as a direct and proximate result of infringement by Defendants of their copyrights and exclusive rights. Publishers are entitled to statutory damages in the amount of up to $150,000 for each work infringed pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Publishers, pursuant to 17 U.S.C. § 504(b), Publishers are further entitled to recover from Defendants the damages they have sustained and will sustain, as well as any gains, profits and advantages obtained by Defendants as a result of their acts of infringement alleged above. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiffs.

72.    Publishers should also be awarded their costs and reasonable attorneys' fees as the prevailing party pursuant to 17 U.S.C. § 505.

73.    Defendants' infringement has caused, and continues to cause, irreparable injury to Publishers in an amount not readily capable of determination and for which there is no adequate remedy at law. Thus, Publishers are also entitled to permanent injunctive relief prohibiting infringement of their copyrights and exclusive rights pursuant to 17 U.S.C. § 502.

## PRAYER FOR RELIEF

WHEREFORE, Publishers respectfully request judgment against Defendants as follows:

A.  Declaring that the practices of Defendants in connection with Publishers' Works in Suit constitute willful copyright infringement;

B.  Issuing a permanent injunction (1) enjoining Anna's Archive, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms, corporations, or others acting in active concert or participation with each or any of them, from directly or indirectly reproducing, distributing, publicly displaying, creating derivative works, or otherwise infringing any of the respective copyrighted works owned or exclusively controlled, in whole or in part, by Plaintiffs, whether now in existence or hereinafter created; (2) ordering that all unlawful copies of Plaintiffs' copyrighted works be destroyed; and (3) directing third-party internet registries, domain name registrars, data centers, and hosting and service providers to refrain from frustrating, and to reasonably assist in the implementation of, the relief described above, including without limitation by ceasing any hosting services for the websites located at annas-archive.org, annas-archive.li, annas-archive.gl, annas-archive.pm, annas-archive.se, annas-archive.vg, annas-archive.pk, annas-archive.gd, or any other websites that host the infringing content or directly facilitate its distribution; by disabling the annas-archive.org domain name and making it inactive and untransferable; and by disabling the authoritative nameservers for the annas-archive.li, annas-archive.gl, annas-archive.pm, annas-archive.se, annas-archive.vg, annas-archive.pk, and annas-archive.gd websites and making them inactive and untransferable.

C.  Entering judgment for Plaintiffs against Defendants for statutory damages pursuant to 17 U.S.C. § 504(c), in an amount based upon Defendants' willful acts of infringement of the

Works in Suit, as alleged above, up to the maximum amount of $150,000 per infringed

work;

D.  Awarding Plaintiffs the costs and disbursements of this action, including reasonable

attorney's fees, pursuant to 17 U.S.C. § 505;

E.  Awarding Plaintiffs pre-judgment and post-judgment interest, to the fullest extent

available, on the foregoing; and

F.  Granting such other further and different relief as this Court deems just and proper.


## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues

so triable in this action.


Dated: March 6, 2026                    Respectfully submitted,

*/s/ Matthew J. Oppenheim*
Matthew J. Oppenheim
Keith Howell (*pro hac vice forthcoming*)
**OPPENHEIM + ZEBRAK, LLP**
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
matt@oandzlaw.com
khowell@oandzlaw.com

Jennifer L. Pariser
**OPPENHEIM + ZEBRAK, LLP**
461 5th Avenue, 19th Floor
New York, N.Y. 10017
Phone: (212) 951-1156
jpariser@oandzlaw.com

*Attorneys for Plaintiffs*